UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------- X

ING BANK N.V.,

                         Plaintiff,

           -v-

M/V TEMARA et al.,

                   Defendants.

-------------------------------------------------------------X

|  |
|---|
| USDC SDNY |
| DOCUMENT |
| ELECTRONICALLY FILED |
| DOC #: _____ |
| DATE FILED: <u>August 24, 2016</u> |

16-cv-95 (KBF)

<u>OPINION & ORDER</u>

KATHERINE B. FORREST, District Judge:

      While technological developments have fundamentally altered the ways many industries conduct business, for those whose trade involves plying the vast oceans, certain things remain as they have always been.  The large ships that are hired to transport and deliver cargo across the globe still need a basic supply of fuel to get where they need to go.  Hence, the buying and selling of quantities of fuel (known as bunkers) remains an active trade the world over.

      As in any industry, the companies in the bunker business come and go, and sometimes when they go they leave the detritus of unresolved business in their wake.  This case arises out of such unresolved business.  Indeed, this is one of many cases in this district and around the country and planet that has resulted from the November 2014 collapse of O.W. Bunker & Trading A/S ("OW Bunker"), formerly the world's largest bunker supplier, and may other affiliated entities.  The basic pattern, in both this case and many others, is that the relevant OW Bunker entities

arranged to have bunkers provided to a ship by a physical supplier, the bunkers were delivered, and then the OW Bunker companies collapsed before anyone was paid.  This <u>in rem</u> action against the ship for the value of the unpaid bunker invoice followed.

The physical supplier in this case was CEPSA International B.V. ("CEPSA") and the ship was the M/V TEMARA ("TEMARA").  Now before the Court are dueling summary judgment motions regarding CEPSA's entitlement to a maritime lien against the TEMARA and a breach of contract claim against ING Bank N.V. ("ING"), a bank and the purported assignee of OW Bunker's assets.  (ECF Nos. 47 & 58.)  CEPSA's request for payment from the funds deposited in the Court's registry appeals to a sense of an orderly business transaction: it delivered fuel and now seeks compensation.  However, maritime liens are creatures of law that must be strictly limited to their statutory basis.  For the reasons stated below, CEPSA does not hold, and never held, a valid maritime lien against the TEMARA.  It has also not entered into any contract with ING which ING could be capable of breaching.  Accordingly, the motion to dismiss CEPSA's intervening complaint (ECF No. 47) is GRANTED and CEPSA's cross-motion for summary judgment (ECF No. 58) is DENIED.

I.      FACTUAL BACKGROUND[1]

On December 19, 2013, ING executed a Security Agreement with OW Bunker and various affiliates.  (ECF No. 46-4 at 14-94.)  Under the terms of the Security

---

[1] The following facts are undisputed unless otherwise stated.

Agreement, which is governed by English law, OW Bunker assigned its rights and interest in New Supply Contracts, including the one at issue here, to ING.[2]  Under the terms of the Security Agreement, OW Bunker did not assign or transfer any corresponding obligations, liabilities, or debts associated with such contracts.  (ECF No. 124 at 24.)

The vessel at issue in the instant action, the TEMARA, is owned by Cimpship Transportes Maritimos, S.A. ("Cimpship") and during the relevant period in 2014 was chartered by Copenship Bulkers A/S ("Copenship").  In October 2014 Copenship contacted OW Bunker to arrange for the TEMARA to be supplied with bunkers at an upcoming stop in Balboa, Panama.  OW Bunker responded by sending Copenship a Sales Order Confirmation for the sale of 400 metric tons of fuel, each costing $536.  (ECF No. 47-2 at 8-10.)  Payment was made due "WITHIN 30 DAYS FROM DATE OF DELIVERY UPON PRESENTATION OF INVOICE."  The document listed an address in Denmark and Danish email addresses and telephone numbers for OW Bunker.

The Confirmation also made the agreed-upon sale "subject to the OW Bunker Group's Terms and Conditions of sale(s) for Marine Bunkers" and provided that "acceptance of the marine bunkers by the vessel … shall be deemed to constitute acceptance of the said general terms."  The 15-page Terms and Conditions of sale for Marine Bunkers Edition 2013 (ECF No. 47-6 at 99-115) in turn set forth that

---

[2] The Court only recounts the contents of the Security Agreement and expresses no view as to whether the purported assignment was proper and valid; that is the topic of a separate motion in this litigation.

"[a]n Agreement shall only be concluded and binding on the Seller when the Seller sends the Order Confirmation to the Buyer," and that each such confirmation would incorporate the Terms and Conditions.

The Terms and Conditions define "Seller" to mean OW Bunker and "Buyer" to mean

> the vessel supplied and jointly and severally her Master, Owners, Managers/Operators, Disponent Owners, Time Charterers, Bareboat Charterers and Charterers or any party requesting offers or quotations for or ordering Bunkers and/or Services and any party on whose behalf the said offers, quotations, orders and subsequent agreements or contracts have been made.

"Supplier" was defined as "any party instructed by or on behalf of the Seller to supply or deliver the Bunkers."

The Terms and Conditions were made applicable to all orders, agreements, and contracts "except where otherwise is expressly agreed in writing by [the International O.W. Bunker Group, or OWB]." They also provided that "[g]eneral trading conditions of another party will not apply, unless expressly accepted in writing by OWB." The Agreement was to be "governed and construed in accordance with English law," but "[t]he General Maritime Law of the United States shall always apply with respect to the existence of a maritime lien."

Under the Terms and Conditions, title in and to the bunkers was to remain with the Seller until full payment was made, and that payment "shall be made in full, without set-off, counterclaim, deduction and/or discount." The Buyer was "obliged to make payments in full … whether or not it has any claims or complaints."

The Terms and Conditions also contained a section labeled "Exemptions and Force Majeure."  One of the provisions in this section, L.4, read as follows:

> (a)  These Terms and Conditions are subject to variation in circumstances where the physical supply of the Bunkers is being undertaken by a third party which insists that the Buyer is also bound by its own terms and conditions.  In such circumstances, these Terms and Conditions shall be varied accordingly, and the Buyer shall be deemed to have read and accepted the terms and conditions imposed by the said third party.
>
> (b)  Without prejudice to the generality of the foregoing, in the event that the third party terms include:
>
>> (i)  A shorter time limit for the doing of any act, or the making of any claim, then such shorter time limit shall be incorporated into these terms and conditions.
>>
>> (ii)  Any additional exclusion of liability clause contained in third party terms shall be incorporated mutatis mutandis into these terms and conditions.
>>
>> (ii[i])  A different law and/or forum selection for disputes to be determined, then such law selection and/or forum shall be incorporated into these terms.
>>
>> The terms hereof shall be varied to apply any of the terms being imposed on Sellers by the third party supplier.
>
> (c)  It is acknowledged and agreed that the buyer shall not have any rights against the supplier which are greater or more extensive than the rights of the supplier against the Third Party.

Neither the Confirmation nor the Terms and Conditions contain any reference to the Seller acting as the Buyer's agent or possessing the power to bind the Buyer to any agreement.

After the agreement between Copenship and OW Bunker was reached, OW Bunker utilized the services of OW Bunker USA Inc. ("OW USA"), a "bunker intermediary."  The record before the Court is notably devoid of any documentation

of the arrangement between OW Bunker and OW USA.  The Court does not, for example, know whether these companies are sister corporations or whether one is a subsidiary of the other, whether they feature joint or separate ownership, or indeed how they enter into agreements with one another.

On October 3, 2014, the same day OW Bunker and OW USA entered into an agreement, OW USA also contracted with CEPSA to physically supply bunkers to the TEMARA.  CEPSA's confirmation document was addressed to "O.W. BUNKER USA INC. ATTN: HELENA RIOS," and it listed the Buyer as "O.W. BUNKER USA INC.," the Seller as "CEPSA PANAMA S.A.," and the Vessel as "MV TEMARA." (ECF No. 47-4.)  This confirmation, like the previous one OW Bunker issued to Copenship, recited the fuel quantity as 400 metric tons, but listed a lower unit price at $526.  OW USA also memorialized this contract in its own Purchase Order Confirmation, which listed a Texas address and phone number for the company. (ECF No. 47-3.)  Neither confirmation referenced OW Bunker (as opposed to OW USA) or Copenship, but both referenced the TEMARA.

CEPSA's confirmation document listed the following term: "CEPSA GENERAL TERMS AND CONDITIONS OF SALE (REV. OCT 01, 2011) TO APPLY, A COPY OF WHICH AVAILABLE ON REQUEST."  Several of those Terms and Conditions are potentially relevant to the instant dispute.  (ECF No. 59-4.)

In CEPSA's Terms and Conditions, CEPSA is identified as "THE SELLER," while "THE BUYER" is the entity that provides CEPSA "written notice of the Request for Supply," which must comply with certain informational requirements.

6

These Terms and Conditions repeatedly distinguish between the Buyer and "the Ship's Master or his representative;" for example, while sampling of the bunkers must occur "in the presence of the 'BUYER' or the Ship's Master, or their respective representatives," the bunker receipt after fuel delivery "must be signed by the Ship's Master supplied, or the agent."  The Buyer's Final Order also must identify "[t]he name and address of the person or company that is expressly assigned as the agent of the ship to be supplied at the location or port of supply."

The invoicing and payment terms provide that payment shall be made by the Buyer to the Seller, but also that

> "THE BUYER" and the Ship Owner Company shall be joint and severally liable for payments of the price of the Marine Fuel supplied and, thus, the "SELLER" may enforce his credit, in the manner and within the legal limits foreseen, on the ship bunkered and on the chartered goods accrued thereon.

CEPSA's Terms and Conditions also provide that title of the bunkers transfers to the Buyer once it has fully paid CEPSA the purchase price, but "[u]p to that moment, 'THE SELLER' shall continue to be the owner of the Marine Fuel supplied."  Among the final provisions in the document is a prohibition on the Buyer assigning all or part of the supply ordered to a third party without the Seller's prior written consent.

The Terms and Conditions do not identify the Buyer as the agent of the ship's owner, charterer, or any other entity.

On October 9, 2014, CEPSA physically supplied bunkers to the TEMARA in Balboa, Panama.  After delivery, CEPSA generated and provided a Bunker Receipt,

7

which was signed by the TEMARA's Chief Engineer, who also stamped the receipt with a stamp bearing the names Cimpship and TEMARA.  (ECF No. 47-2 at 27.)

Also on October 9, 2014, OW Bunker issued an invoice in the amount of $221,812.95 to the TEMARA and its charterer, Copenship.  (ECF No. 47-2 at 26.) Payment was made due "30 days from date of delivery."  The invoice further stated that "All O.W. BUNKER & TRADING A/S's rights under this invoice and the supply contract between us (the Supply Contract) have been assigned in favour of ING Bank N.V." and instructed Copenship "to pay all amounts payable under this invoice to … ING Bank N.V."  The invoice does not reference either OW USA or CEPSA.  Neither OW Bunker nor ING was ever paid the amount listed on the invoice.

On October 13, 2014, CEPSA issued an invoice in the amount of $217,859.49 to OW USA, again listing a Texas address.  (ECF No. 47-5.)  Payment was made due November 8, 2014, and was directed to "be made directly to CEPSA INTERNATIONAL B.V."  The invoice does not reference OW Bunker, Copenship, or Cimpship.  CEPSA was never paid the amount listed on the invoice.

The OW Bunker collapse occurred in November 2014.  OW USA purportedly remains in Chapter 11 bankruptcy before the United States Bankruptcy Court for the District of Connecticut.  (ECF No. 47-1 at 8.)

On May 22, 2015, ING filed a complaint against the TEMARA in rem in the District of Maryland.  (ECF No. 1.)  Thereafter, CEPSA filed an intervenor complaint against the TEMARA in rem, on the basis of a maritime lien, unjust

enrichment, and trespass, and against ING and OW Bunker <u>in personam</u>, on the basis of a breach of contract, the same day.  (ECF No. 18.)  The TEMARA and ING each answered CEPSA's intervenor complaint, and CEPSA dismissed its claim against OW Bunker.  (ECF Nos. 30, 33, & 56.)  On July 6, 2015, funds in the amount of $266,175.54 were deposited in the Court's registry.

On September 28, 2015, ING moved for summary judgment to dismiss CEPSA's intervening complaint.  (ECF No. 47.)  On October 16, 2015, CEPSA opposed ING's motion and cross-moved for summary judgment in its favor on the question of its entitlement to a maritime lien against the TEMARA.  (ECF Nos. 58 & 59.)

This action was transferred from the District of Maryland to the Southern District of New York in January 2016, after the instant motions were filed.  (ECF No. 95.)  It was assigned to Judge William H. Pauley III, who heard oral argument on the motions and permitted the parties to submit additional supplemental briefing.  (ECF Nos. 111-1, 113, 117-1, 121, 124, & 126.)

As discussed above, a number of cases which have been filed in or transferred to this district all stem from the collapse of OW Bunker.  A large number of these cases are before Judge Valerie E. Caproni.  A number of other cases have been transferred to the undersigned including, on May 10, 2016, this case.[3]  Similar questions regarding physical suppliers' entitlement to maritime liens have also been

---

[3] The case numbers of the other matters before the undersigned are 14-cv-9447, 15-cv-2992, 16-cv-2051, 16-cv-2923, 16-cv-3456, 16-cv-4312, and 16-cv-6453.

briefed in two other cases before the undersigned,[4] and the instant decision is being issued simultaneously with equivalent decisions in those cases.

## II.    LEGAL PRINCIPLES

### A.    Summary Judgment Standard

Summary judgment may not be granted unless a movant shows, based on admissible evidence in the record, "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The moving party bears the burden of demonstrating "the absence of a genuine issue of material fact."  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). On summary judgment, the Court must "construe all evidence in the light most favorable to the nonmoving party, drawing all inferences and resolving all ambiguities in its favor."  Dickerson v. Napolitano, 604 F.3d 732, 740 (2d Cir. 2010). The Court's function on summary judgment is to determine whether there exist any genuine issues of material fact to be tried, not to resolve any factual disputes. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248-49 (1986).

### B.    Maritime Liens

"As a general rule, maritime liens are disfavored by the law."  Itel Containers Int'l Corp. v. Atlanttrafik Express Serv. Ltd., 982 F.2d 765, 768 (2d Cir. 1992). They can arise only by operation of law, and not by the agreement of the parties. See, e.g., Bird of Paradise, 72 U.S. 545, 555 (1866).  Moreover, because these liens

---

[4] Aegean Bunkering (USA) LLC v. M/T AMAZON, 14-cv-9447 and O'Rourke Marine Services L.P. v. M/V COSCO HAIFA, 15-cv-2992.

operate without requiring the parties' agreement, the statutory provisions creating maritime liens are <u>stricti juris</u> and will be accorded a technical and precise interpretation that will not be extended by construction, analogy, or inference.  <u>Itel Containers</u>, 982 F.2d at 768 (citing <u>Piedmont & Georges Creek Coal Co. v. Seaboard Fisheries Co.</u>, 254 U.S. 1, 12 (1920)).

The type of lien at issue in this case is a maritime lien for necessaries is set forth in the Commercial Instruments and Maritime Lien Act ("CIMLA").[5]  Under the statutory scheme, a party claiming a maritime lien against a vessel must show it (1) provided necessaries, (2) to any vessel, (3) upon the order of the owner of the vessel or a person authorized by the owner.  46 U.S.C. § 31342(a).  "Necessaries" include, among other things, supplies.  <u>Itel Containers</u>, 982 F.2d at 767.  CIMLA also lists "persons … presumed to have authority to procure necessaries for a vessel:"

> (1) the owner;
>
> (2) the master;
>
> (3) a person entrusted with the management of the vessel at the port of supply; or
>
> (4) an officer or agent appointed by--
>
>> (A) the owner;
>>
>> (B) a charterer;
>>
>> (C) an owner pro hac vice; or

---

[5] These statutory provisions were formerly part of the Federal Maritime Lien Act ("FMLA") until a 1988 recodification.  Because there were no substantive changes, it is generally accepted that cases interpreting the FMLA statutory scheme prior to 1988 remain instructive to questions regarding CIMLA today.  <u>See, e.g.</u>, <u>Integral Control Sys. Corp. v. Consolidated Edison Co. of NY, Inc.</u>, 990 F. Supp. 295, 298 (S.D.N.Y. 1998) (Haight, J.).

(D) an agreed buyer in possession of the vessel.

46 U.S.C. § 31341(a).

C.    <u>Agency</u>

"Agency is the fiduciary relationship that arises when one person (a 'principal') manifests assent to another person (an 'agent') that the agent shall act on the principal's behalf and subject to the principal's control, and the agent manifests assent or otherwise consents so to act." <u>Restatement (Third) of Agency</u> § 1.01 (2006).  Agency can result from "actual" or "true" authority, which can be either express or implied, <u>id.</u> § 2.01, or "apparent" authority, which results "when a third party reasonably believes the actor has authority to act on behalf of the principal and that belief is traceable to the principal's manifestations." <u>Id.</u> § 2.03.  The burden of proving an agency relationship is on the party who asserts the existence of the relationship.  <u>See</u> <u>Garanti Finansal Kiralama A.S. v. Aqua Marine & Trading Inc.</u>, 697 F.3d 59, 72 (2d Cir. 2012).  "While the existence of an agency relationship often turns on questions of fact, the issue is properly resolved as a matter of law where, as here, the relevant facts are uncontroverted." <u>Johnson v. Priceline.com</u>, 711 F.3d 271, 275 (2d Cir. 2013).

D.    <u>Unjust Enrichment</u>

A claim for unjust enrichment is made out when a plaintiff shows (1) that the defendant was enriched; (2) at the plaintiff's expense; and (3) that equity and good conscience require restitution.  <u>Kaye v. Grossman</u>, 202 F.3d 611, 616 (2d Cir. 2000).  "The theory of unjust enrichment lies as a quasi-contract claim.  It is an obligation

the law creates in the absence of any agreement." <u>Beth Israel Medical Ctr. v. Horizon Blue Cross & Blue Shield of N.J., Inc.</u>, 448 F.3d 573, 586 (2d Cir. 2006). "[T]he existence of a valid and enforceable written contract governing a particular subject matter ordinarily precludes recovery in quasi contract for events arising out of the same subject matter." <u>Integral Control Sys. Corp. v. Consolidated Edison Co. of N.Y.</u>, 990 F. Supp. 295, 303 (S.D.N.Y. 1998) (quoting <u>Clark-Fitzpatrick, Inc. v. Long Island R.R. Co.</u>, 70 N.Y.2d 382, 388 (1987)).

      E.    <u>Trespass/Conversion</u>

"In the admiralty context, as elsewhere, conversion is simply an intentional and wrongful exercise of dominion or control over a chattel, which seriously interferes with the owner's rights in the chattel." <u>Evergreen Marine Corp. v. Six Consignments of Frozen Scallops</u>, 4 F.3d 90, 94 (1st Cir. 1993).

      F.    <u>Breach of Contract</u>

"To establish a <u>prima facie</u> case for breach of contract, a plaintiff must plead and prove: (1) the existence of a contract; (2) a breach of that contract; and (3) damages resulting from the breach." <u>Nat'l Market Share, Inc. v. Sterling Nat'l Bank</u>, 392 F.3d 520, 525 (2d Cir. 2004).

III.    ANALYSIS

      A.    <u>CEPSA's Entitlement To A Maritime Lien</u>

The parties do not dispute that CEPSA provided fuel bunkers, which are necessaries, to the TEMARA.  Thus, CEPSA's entitlement to a maritime lien under

the CIMLA statutory scheme turns on whether it furnished those bunkers "on the order of the owner or a person authorized by the owner."  46 U.S.C. § 31342(a).

ING's position is that CEPSA's contractual relationship was exclusively with OW USA and that OW USA was not "authorized by the owner" of the TEMARA to procure necessaries for the vessel.  Accordingly, ING argues, CEPSA is merely a sub-subcontractor in relation to the TEMARA (the two intervening contractors being OW Bunker and OW USA) and cannot assert a maritime lien under CIMLA.

The core of CEPSA's response is that it supplied bunkers to a vessel and was not paid for its fuel and, accordingly, it must have a maritime lien against that vessel in either law or equity.  CEPSA advances two theories for the formation of the lien, one based on principles of agency and an interpretation of the chain of contracts between Copenship, OW Bunker, OW USA, and CEPSA, and another based on the Bunker Receipt signed onboard the TEMARA following delivery.  Neither theory succeeds.

### 1.    Authorization Through The Contractual Chain

CEPSA entered into a two-party transaction with OW USA.  None of the documents in the record that relate to this agreement reference an agency relationship of any kind; the nomination, confirmations of purchase and sale, and invoice are all set up such that OW USA, based in Texas, is the Buyer and CEPSA is the seller.  The documents contain no reference to the involvement, or even existence, of OW Bunker, much less Copenship or Cimpship.  CEPSA's Terms and Conditions make clear that OW USA, as the entity that provided the necessary

14

information in the correct form to place an order, was the Buyer, and the invoice provided that the bunkers were "sold to" OW USA, not any other corporation.  The specificity of the two-party relationship is further evidenced by the provisions in the CEPSA Terms and Conditions which differentiate OW USA, as Buyer, from agents of the Ship Master, and which also prohibit OW USA from assigning its order "without the prior written consent of the 'SELLER.'"  (ECF No. 58-5 at 20.)

As a result of the above, it is evident and beyond dispute that the contract between CEPSA and OW USA was just that: a contract between two parties without any indication or expectation that either party were thereby binding a distinct principal.  Therefore, CEPSA provided the bunkers not on the orders of the TEMARA's owner or someone authorized by the owner, but instead on the orders of a subcontractor.  Such an action does not create a maritime lien.

Additional rungs of the ladder of relevant contracts further provide independently dispositive obstacles to CEPSA's ability to prove the agency relationship it needs to assert to succeed.  As discussed, there is no documentation in the record of the contract, if any, between OW Bunker and OW USA.  To carry its burden of proving an agency relationship, CEPSA would need to demonstrate that this agreement was consistent with an agreement to operate on behalf of the TEMARA and its owner or charterer as principal.

More importantly, at the top of the ladder, the agreement between Copenship and OW Bunker does not establish any actual or apparent authority by which OW Bunker could bind Copenship or the TEMARA.  There is no provision such that "an

entity authorized to bind the ship [here, Copenship] controlled the selection of the subcontractor [here, OW USA and then CEPSA] and/or its performance." <u>Lake Charles Stevedores, Inc. v. PROFESSOR VLADIMIR POPOV MV</u>, 199 F.3d 220, 229 (5th Cir. 1999).  Yet that is precisely what must be shown if an entity other than the general contractor that contracts directly with the owner or charterer of a vessel is to receive a maritime lien.  <u>Id.</u>

Simply put, CEPSA cannot point to any evidence in the record that demonstrates or even suggests Copenship either agreed to be bound by OW Bunker's actions on its behalf or acted in a way that suggested it had so agreed.  If there is no actual or apparent authority, there is no agency relationship, and under CIMLA there is no maritime lien.

In light of the absence of any evidence of an actual agency relationship, CEPSA turns to one provision in the OW Bunker Terms and Conditions, which it interprets to incorporate its own Terms and Conditions entirely.  This is an uphill battle for CEPSA from the start: as discussed, a contract cannot create a maritime lien.  <u>Triton Marine Fuels Ltd. v. M/V PACIFIC CHUKOTKA</u>, 575 F.3d 409, 416 (4th Cir. 2009).  It is, however, conceivable that a contract could reflect the existence of an agency relationship and/or a maritime lien – thus not creating one, but evidencing one.  <u>Cf.</u> <u>World Fuel Servs. Singapore Pte, Ltd. v. Bulk Juliana M/V</u>, 822 F.3d 766, 774 (5th Cir. 2016).

The portion of the OW Bunker Terms and Conditions at issue is section L.4, which provides, under the heading "EXEMPTIONS AND FORCE MAJEURE," that

16

"where the physical supply of the fuel is being undertaken by a third party which insists that the Buyer is also bound by its own terms and conditions … the Buyer shall be deemed to have read and accepted the terms and conditions imposed by the said third party."  (ECF No. 47-2 at 22.)  CEPSA argues that this provision sweeps all of CEPSA's Terms and Conditions into the contract between Copenship and OW Bunker and creates a direct contractual relationship between the vessel interests and CEPSA giving rise to a maritime lien.

CEPSA's reading of section L.4, while vigorously asserted, is fundamentally incorrect.  The interpretation CEPSA advances is at odds with both a number of specific provisions in the OW Bunker Terms and Conditions and the overall structure of that contract.  Moreover, even if one were to temporarily accept CEPSA's interpretation of the contract for the purposes of argument, there is no evidence in the record which could support the other factual inferences necessary for CEPSA to succeed on this theory.

The OW Bunker Terms and Conditions are quite clear that they set out a carefully specified contract between two parties, the Buyer (Copenship) and the Seller (OW Bunker).  It is not the kind of agreement that anticipates unforeseen future amendment; for instance, near the top of the document section A.3 provides that "[g]eneral trading conditions of another party will not apply, unless expressly accepted in writing by OWB."  The Terms and Conditions define "Agreement" as "the concluded terms for the sale/purchase of the Bunkers," and then go on to set out the specific steps the parties must complete in order to reach that conclusion.

17

Nowhere in the sequence laid out in the Terms and Conditions is there a stage that anticipates that a third party may alter the agreement.

The OW Bunker Terms and Conditions also set forth payment terms in section I that are inconsistent with CEPSA's interpretation of section L.4. As with the rest of the agreement, the relevant identified parties are the Buyer and the Seller. Importantly, per section I.2, the payment required of the Buyer "shall be made in full, without set-off, counterclaim, deduction and/or discount." This specific provision, which in the contract at issue required Copenship to pay OW Bunker and no other entity, cannot be reconciled with CEPSA's argument that a different portion of the Terms and Conditions allows CEPSA to step into OW Bunker's shoes and substitute its own payment terms. Such an arrangement would result in the kind of set-off of Copenship's obligations to OW Bunker that the Terms and Conditions specifically prohibit.

The language in section L.4 must be read against this overall structure and specific contrary provisions within the OW Bunker Terms and Conditions. L.4 creates an exception "where the physical supply of the fuel is being undertaken by a third party" and where there are "terms and conditions imposed by the third party on the Seller." The overall structure of the Terms and Conditions, and in particular the requirement in section A.3 that other parties' trading conditions apply only when "expressly accepted in writing," indicate that the condition that terms be "imposed" requires more than those terms simply being referenced as applicable. Likewise, the requirement that the third party "insist[] that the Buyer is also bound

18

by its own terms and conditions" indicates that, for L.4 to apply the supplier must have specifically referenced and obligated the Buyer, Copenship. As discussed above, CESPA's contracts and terms do not reference Copenship or any entity in its position. Finally, section L.4 at most reaches conditions that result from an arrangement between the Seller, OW Bunker, and a third party. As discussed above, there is no arrangement directly between OW Bunker and CEPSA; all of CEPSA's arrangements were with OW USA.

It is thus clear that there is no evidence from which one could conclude that there is a material question as to whether CEPSA acted on the orders of the TEMARA's owner or someone authorized by the owner to act on its behalf. It did not, and accordingly it cannot assert a maritime lien against the vessel under CIMLA. This outcome is consistent with the limited and disruptive nature of this remedy. "Because a maritime lien is deemed to encumber commerce, it is disfavored in the law and its requisites are construed stricti juris by the courts." Cianbro Corp. v. George H. Dean, Inc., 596 F.3d 10, 14 (1st Cir. 2010) (internal quotation marks and citations omitted). CEPSA, as a sub-subcontractor that Copenship played no role in selecting or supervising, cannot avail itself of a maritime lien against the vessel at the top of the contractual chain. See, e.g., id. at 16-17; Lake Charles Stevedores, Inc. v. PROFESSOR VLADIMIR POPOV MV, 199 F.3d 220, 229 (5th Cir. 1999).

CEPSA argues that this outcome ignores the fundamental supplier-protective purposes of CIMLA and maritime liens for the provision of necessaries. CEPSA did,

after all, undisputedly supply necessaries to the TEMARA, and it undisputedly has not been paid for that supply.  In support of this view in its briefing and at oral argument, CEPSA has invoked a decision by the Canadian Federal Court, <u>Canpotex Shipping Servs. Ltd. v. Marine Petrobulk Ltd.</u>, 2015 F.C. 1108 (Can.), which CEPSA argues held "under nearly identical facts" that "a broker trader is never entitled to a maritime lien without having paid the physical supplier."  (ECF No. 117-1 at 1.)

However, <u>Canpotex</u> is a Canadian case, which is important not only because it renders the decision, however well-reasoned, non-binding on this and every other U.S. court, but also because our two countries have distinct statutory schemes setting forth the requirements for maritime liens.  Most importantly, the relevant Canadian statute only imposes a requirement that an action be taken at the request of a vessel owner or his agent "with respect to stevedoring or lighterage;" no such requirement exists for the supply of necessaries.  Marine Liability Act, SC 2001, c 6 § 139(2.1).  In the United States, in contrast, this authorization is a necessary predicate to any maritime lien for necessaries.  46 U.S.C. § 31342(a).

This difference, and the absence of any orders from the TEMARA's owner or its agents in this case, dictate a different result from <u>Canpotex</u>.  Instead, this matter is more like the one that faced Judge Charles S. Haight, an éminence grise of maritime law in this district, in <u>Integral Control Systems Corp. v. Consolidated Edison Co. of New York</u>, 990 F. Supp. 295 (S.D.N.Y. 1998).  In that case, a vessel owner contracted with a shipyard for conversion work on a barge and the shipyard in turn contracted with subcontractors.  <u>Id.</u> at 297.  When the shipyard failed to pay

the subcontractors, they initiated an action against, among others, the vessel <u>in rem</u> on the basis of a maritime lien.  <u>Id.</u>

Judge Haight ruled that "the case turns upon whether these plaintiffs can show, as they must, that they rendered their services to the vessel 'on the order of the owner or person authorized by the owner.'"  <u>Id.</u> at 299 (quoting 46 U.S.C. § 31342).  He identified the plaintiffs' "difficulty" as "aris[ing] from the undisputed fact that they contracted to render these services not with [the vessel owner], but with [the shipyard]."  <u>Id.</u>  This, he ruled, was dispositive: given the "considerable body of law supporting the proposition that a subcontractor cannot assert a maritime lien against a vessel," <u>id.</u>, and "the Second Circuit's current commitment to a <u>stricti juris</u> approach to maritime liens," <u>id.</u> at 301, the subcontractors were not entitled to a maritime lien against the vessel on which they had performed work.

A subcontractor relationship without any indication that the vessel owner selected, supervised, or was even aware of the eventual physical supplier will not create a maritime lien against that vessel.  To find otherwise would be to allow vessels to be arrested and encumbered based on the contractual disputes that arise between general contractors and subcontractors or even, as in this case, between subcontractors and sub-subcontractors.  This is not in keeping with the CIMLA statutory scheme, and as a result there can be no dispute that CEPSA does not have a maritime lien against the TEMARA.

2. <u>Authorization From The Signed Bunker Receipt</u>

21

CEPSA's alternative theory of a maritime lien is that it acted pursuant to orders from one authorized to act for the TEMARA's owner is based on the Bunker Receipt which was signed onboard the TEMARA following the delivery of the bunkers.  CEPSA argues that the Chief Engineer who signed the document falls within the definition of "an officer or agent appointed by" the owner or charterer, 46 U.S.C. § 31341(a)(4), and that he was therefore statutorily entitled to (and did) authorize the provision of necessaries as they were being provided.

In support of this view, CEPSA cites a number of cases involving vessel officers binding their vessel and creating a maritime lien.  Careful examination of these cases, however, differentiates them from the instant case.  For example, in Marine Fuel Supply & Towing, Inc. v. M/V Ken Lucky, 869 F.2d 473 (9th Cir. 1988), the "chief engineer accepted the bunkers, acknowledging receipt," but he specifically did so "with the approval of the master," who the Ninth Circuit noted "had presumed authority to incur a lien under the Act." Id. at 478.  Similarly, in The Eastern, 257 F. 874 (D. Mass. 1919), "[t]he management of the vessel in respect to her coal supply was intrusted [sic] to … her chief engineer," who not only received but also ordered the fuel in the first place.  Id. at 875.

In the case of the TEMARA, in contrast, the Bunker Receipt was signed by a chief engineer who otherwise does not appear in the relevant sequence of events.  He is not purported to have ordered the fuel, played any role in determining how and by whom it would be delivered, or done anything more than acknowledging CEPSA's delivery.  In so doing, the chief engineer played a role that was specifically

22

required by CEPSA's Terms and Conditions, yet those same terms and conditions were clear that it was the Buyer, OW USA, that was to pay CEPSA's invoice.

There is also no indication that the chief engineer was granted any particular authority by the owner, the charterer, or even the vessel's master.  Chief engineers are not, without more, among those CIMLA statutorily authorizes to bind vessels for the provision of necessaries.  While there may be circumstances in which a vessel's officers may properly bind a vessel, no fact support a determination that this case is within that class.  The limited role of the TEMARA's chief engineer in the instant action cannot support the weight of a maritime lien, and CEPSA thus cannot assert such a lien against the vessel <u>in rem</u>.

B.    <u>CEPSA's Entitlement To In Rem Recovery For Unjust Enrichment</u>

As an alternative to its claims of a statutory maritime lien, CEPSA advances alternative equitable theories for <u>in rem</u> recovery against the TEMARA.  The first of these is that CEPSA has at all times retained title to the bunkers it provided, but that the vessel has unjustly benefitted from the use of those bunkers.  This, CEPSA argues, establishes an <u>in rem</u> claim against the TEMARA and the funds deposited in the Court's registry under the principles of unjust enrichment.

CEPSA sets up this argument by referring first to the fact that admiralty jurisdiction and maritime law are grounded in principles of equity.  <u>See</u> <u>The Virgin</u>, 33 U.S. 538, 550 (1834) ("[C]ourts of admiralty…are not governed by the strict rules of the common law, but act upon enlarged principles of equity."); <u>Smith v. Seaport Marine, Inc.</u>, 981 F. Supp. 2d 1188, 1203 (S.D. Ala. 2013), <u>aff'd</u> 764 F.3d 1302 (11th

Cir. 2014) ("In that regard, the Supreme Court has emphasized the judiciary's role

in 'formulating flexible and fair remedies in the law maritime.'" (quoting Exxon

Shipping Co. v. Baker, 554 U.S. 471, 508 n.21 (2008))).  CEPSA further invokes

Wardley International Bank, Inc. v. Nasipit Bay Vessel, 841 F.2d 259 (9th Cir.

1988), a case in which, CEPSA argues, the Ninth Circuit "applied the principle of

equitable subordination to re-rank the lien priorities of various claimants after

finding that the purported maritime lien holder had engaged in a contrived

financial scheme in an attempted to destroy the liens of suppliers."  (ECF No. 58-1

at 15 (internal quotation marks omitted).)

    CEPSA's argument that maritime law is grounded in equity is well

supported, but it does not follow that equitable principles create a maritime lien

under CIMLA when the statute and facts dictate otherwise.  A number of courts

have rejected the concept of an equitable maritime lien.  See, e.g., The Bird of

Paradise, 72 U.S. (5 Wall) 545, 555 (1866); O'Rourke Marine Servs. L.P. v. M/V

COSCO HAIFA, No. 15-cv-2992 (SAS), 2016 WL 1544742, at *3 (S.D.N.Y. April 8,

2016).

    Just as maritime liens cannot be extended by analogy, they equally cannot be

de facto created in the absence of a valid statutory basis.  See Ocean Cargo Lines,

Ltd. v. N. Atlantic Marine Co., 227 F. Supp. 872, 880 (S.D.N.Y. 1964).  "The

statutory requirement[s]" of a maritime lien "cannot be circumvented by resorting

to the doctrine of unjust enrichment."  Diaz v. The Seathunder, 191 F. Supp. 807,

823 (D. Md. 1961).  Moreover, federal courts exercising their admiralty jurisdiction

24

have explained that, although unjust enrichment claims are available in maritime law, they do not give rise to a lien and are instead purely <u>in personam</u>.  <u>Kane v. Motor Vessel Leda</u>, 355 F. Supp. 796, 801 (E.D. La. 1972), <u>aff'd</u> 491 F.2d 899 (5th Cir. 1974).  CEPSA has not alleged any <u>in personam</u> claim against the TEMARA's owner or charterer, and instead casts its unjust enrichment theory as a means of accessing the registry funds which stand in for the <u>res</u> of the vessel.  It thus follows that CEPSA cannot assert an unjust enrichment claim against the TEMARA <u>in rem</u>.

C.   <u>CEPSA's Entitlement To In Rem Recovery For Trespass</u>

CEPSA's final theory of recovery, which comes in the form of a claim for trespass, is its weakest.  CEPSA's argument on this point is that (1) the confirmation document it provided to OW USA incorporated CEPSA's Terms and Conditions; (2) those Terms and Conditions provide that CEPSA will retain title to the bunkers it provides until payment; (3) CEPSA was never paid, and thus retains title; and (4) the TEMARA nonetheless used the bunkers.  CEPSA argues that this chain of events equates to a trespass.

On the facts alleged in the intervening complaint and the record now before the Court on summary judgment, this trespass claim must fail.  The simple fact is that CEPSA's allegations do not make out a claim for trespass because nowhere in the referenced sequence of contracts and events are the TEMARA interests alleged to have done anything wrong.  "In the admiralty context, as elsewhere, conversion is simply an intentional and wrongful exercise of dominion or control over a chattel,

which seriously interferes with the owner's right in the chattel." <u>In re Millenium Seacarriers, Inc.</u>, No. 02-10180 (CB), 2003 WL 22939112, at *5 (S.D.N.Y. Dec. 11, 2003), <u>aff'd</u> 419 F.3d 83 (2d Cir. 2005) (quoting <u>Evergreen Marine Corp. v. Six Consignments of Frozen Scallops</u>, 4 F.3d 90, 94 (1st Cir. 1993)). "Here, regardless of the validity of [CEPSA's] Terms and Conditions …. there was nothing wrongful or unauthorized in the [TEMARA's] exercise of dominion or control over the fuel oil. In consuming the fuel oil, [the TEMARA] did what [CEPSA] expected it to do." <u>Id.</u>

CEPSA could have refused to provide the bunkers until it was paid; instead, the terms of its contract with OW USA only required payment within 30 days. There is no indication, nor is it possible to imagine, that CEPSA required or ever even conceived of the TEMARA remaining docked and immobile, without making use of the bunkers provided, until such payment was received. Instead, this trespass/conversion argument must be seen for what it is: an attempt to establish a legal position to enhance the chance of recovery which, upon adversarial testing, falls of its own weight.

### D.   <u>CEPSA's Breach of Contract Claim Against ING</u>

The undisputed facts in this case indicate that CEPSA entered into a two-party contract with OW USA. The purchase and sales confirmations and the invoice consistently and exclusively list CEPSA as the seller and OW USA as the buyer. (ECF Nos. 47-3, 47-4, & 47-5.) As discussed, OW Bunker does not appear anywhere on the face of these documents, which constitute the agreement into

which CEPSA entered.  There is thus no indication or evidence that could support an inference that OW USA acted as the agent of another entity in that transaction.

Had CEPSA not performed on the contract, there is no suggestion that ING, OW Bunker, or any company other than OW USA would have been entitled to assert a breach of contract action against CEPSA.  By the same token, CEPSA cannot assert that any entity other than OW USA breached a contractual obligation it owed to CEPSA.  A breach of contract claim will not lie without an underlying contract, and as a result CEPSA's <u>in personam</u> claim against ING must be dismissed.

> E.   <u>Rule 56(d) Does Not Preclude Judgment On CEPSA's Claims</u>

In opposition to ING's motion for summary judgment, CEPSA has articulated a need for further discovery that would preclude the grant of such a motion as premature.  Fed. R. Civ. P. 56(d).  However, the only discovery CEPSA seeks in regard to the instant motions concerns the relationship between ING and OW Bunker.  (ECF Nos. 58-1 at 17-19; 59-1 at ¶¶ 6-7.)  CEPSA argues that further discovery will shed light on the assignment of OW Bunker interests to ING as well as on ING's knowledge of OW Bunker's deteriorating financial condition in 2014.

While evidence on these points might well prove important to a final determination of <u>ING's</u> entitlement to a maritime lien against the TEMARA, it bears no relation to the validity of CEPSA's <u>in rem</u> claim against the vessel and <u>in personam</u> breach of contract claim against ING.  The instant motions are therefore

not premature, and Rule 56(d) is no obstacle to the grant of summary judgment on CEPSA's claims.

IV.     CONCLUSION

For the reasons stated above, ING's motion for summary judgment (ECF No. 47) is GRANTED and CEPSA's cross-motion for summary judgment (ECF No. 58) is DENIED.


        SO ORDERED.

Dated:          New York, New York
                August 24, 2016

                                        _____
                                                KATHERINE B. FORREST
                                               United States District Judge